IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DANIEL OCHOA,                    §
                                 §
            Plaintiff,           §
                                 §
VS.                              §    CIVIL ACTION H-09-1226
                                 §
BP AMERICA, INC., et al.,        §
                                 §
            Defendants.          §

## OPINION AND ORDER

Pending before the Court in the above referenced cause, removed on diversity jurisdiction and alleging employment discrimination in the disparate treatment and termination of Plaintiff Daniel Ochoa based on his national origin (an American citizen of Hispanic descent) under the Texas Commission on Human Rights Act ("TCHRA"), Texas Labor Code §§ 21.001-21.556, are Defendant BP Products North America, Inc.'s ("BP Products'") motion for summary judgment (instrument #18) and request for ruling (#22).

Defendant's request for ruling observes that Plaintiff's attorney requested leave to withdraw, and United States Magistrate Judge France Stacy granted that motion on December 6, 2010 (#21). She gave Plaintiff 60 days to "find new counsel _and_ file a response" to the motion for summary judgment. She also granted a short extension for discovery and docket call. No attorney has

-1-

appeared for Plaintiff, and he has not filed a response to the motion for summary judgment, which has been pending since October 29, 2010.  Furthermore, this case is set for docket call on April 29, 2011, with trial to follow during the next two weeks.  Thus the Court grants the request for ruling and addresses the motion for summary judgment below.

### Standard of Review

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant has the burden to demonstrate that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 317, 323 (1986). The substantive law governing the claims identifies the essential elements and thus indicates which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 317, 325 (1986).

Where the non-movant bears the burden of proof at trial, the movant need only point to the absence of evidence to support an essential element of the non-movant's case; the movant does not have to support its motion with evidence negating the non-movant's case.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant succeeds, the non-movant must come forward with evidence such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.   The non-movant "must come forward with 'specific facts showing there is a genuine issue for trial.'" *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   "A factual dispute is deemed 'genuine' if a reasonable juror could return a verdict for the nonmovant, and a fact is considered 'material' if it might affect the outcome of the litigation under the governing substantive law." *Cross v. Cummins Engine Co.*, 993 F.2d 112, 114 (5th Cir. 1993).   Summary judgment is proper if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322-23; *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006).   Although the court draws all reasonable inferences in favor of the non-movant, the non-movant "cannot defeat summary judgment with conclusory, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Center*, 476 F.3d 337, 343 (5th Cir. 2007). Conjecture, conclusory allegations, unsubstantiated assertions and speculation are not adequate to satisfy the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1079 (5th Cir. 1994); *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).   "'[A] subjective belief of discrimination, however genuine, [may not] be

the basis of judicial relief.'" *Lawrence v. Univ. of Texas Medical Branch*, 163 F.3d 309, 313 (5th Cir. 1999), *quoting Elliott v. Group Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983).  Nor are pleadings competent summary judgment evidence.  *Little,* 37 F.3d at 1075; *Wallace v. Texas Tech. U.*, 80 F.3d 1042, 1045 (5th Cir. 1996).

A district court may not make credibility determinations nor weigh evidence when deciding a summary judgment motion.  *Chevron Phillips*, 570 F.3d 606, 612 n.3 (5th Cir. 2009), *citing EEOC v. R.J. Gallagher Co.*, 181 F.3d 645, 652 (5th Cir. 1999).  Nor does the court have to sift through the record in search of evidence to support opposition to summary judgment.  *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

A motion for summary judgment cannot be granted merely because no opposition has been filed, even though a failure to respond violates a local rule.  *Hibernia National Bank v. Administracion Central Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985), *citing John v. State of La. (Bd. of Trustees for State Colleges & Universities)*, 757 F.2d 698, 709 (5th Cir. 1985).  "The movant has the burden of establishing the absence of a genuine issue of material fact and, unless he has done so, the court may not grant the motion regardless of whether any response was filed.  *Id., citing id.* at 708.  A decision to grant summary judgment based only on default is reversible error.  *Id.*

-4-

The district court is to construe liberally the briefs of *pro se* litigants and apply less stringent standards to them than to parties represented by counsel. *Andrade v. Gonzales*, 459 F.3d 538, 543 (5th Cir. 2006); *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995). Nevertheless, a *pro se* party must still brief his issues. *Grant v. Cuellar*, 59 F.3d at 524; *see also Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993)("'Although [this Court] liberally construe[s] the briefs of pro se appellants, we also require that arguments must be briefed to be preserved.'"), *quoting Price v. Digital Equip. Corp.*, 846 F.2d 1026, 1028 (5th Cir. 1988).

**Allegations of Plaintiff's First Amended Complaint (#9)**

Although pleadings do not constitute competent summary judgment evidence, the governing complaint is the only submission from Plaintiff, so the Court describes his claim and determines whether summary judgment is appropriate here.

Plaintiff alleges that his national origin was a factor in his treatment by, and ultimate termination from his employment at, BP Texas City [BP Products, Inc.], where he had worked without any behavior disciplines from March 1991 until November 2006.

Then in November 2006 he was promoted and transferred to the Health and Safety Department,[1] where he worked as a Compliance Auditor under supervisor Steve Aldridge. In March 2007 he was

---

[1] As becomes apparent from the documentary evidence, the department was actually called Health, Safety, Security and Environmental ("HSSE").

transferred by management, purportedly because the Compliance Auditor "team was not working and . . . it would be easier to transfer him," to Permit Verification, another department in the Health and Safety Department, where he worked on Health and Safety Verification. His new supervisors in Permit Verification were B.J. Wylie and Steven Shutt. The racial/ethnic makeup of that department at that time was three Hispanics, two African Americans, and five Anglo/whites.

In May 2007, Plaintiff was accused of having a disagreement with a contractor. On June 14, 2007 he was given a Decision Making Leave, authored by supervisor B.J. Wylie, in which Plaintiff claims the Company charged acts that had never occurred or that had never been brought to Plaintiff's attention. Each allegation was "personality-related and/or reflected that Plaintiff could not get along in the workplace."

On August 9, 2007, Plaintiff was written up for a practical joke in which he participated with another employee. He claims that before they played the practical joke, supervisor B.J. Wylie was informed that the joke was being played on employee Kurt Voight regarding overtime pay. After the joke was performed, Plaintiff was told he was being suspended by a HSSE Superintendent Kevin Fontenot. On August 13, 2007 Plaintiff met with Fontenot and HSSE manager Jim Wallace, who suspended him for five days without pay. Subsequently the suspension was extended to three weeks because

Plaintiff could not go back to work without the approval of a psychologist.

Plaintiff was placed on permanent probation and a "Last Chance Agreement" was entered on August 20, 2007.

On December 12, 2007 Plaintiff was accused of misconduct in joking with a security personnel member.   Finally he was terminated.

Plaintiff claims his treatment was disparate.   He maintains that he was targeted by B.J. Wylie, as were other Hispanics in the department.   For instance Henry Ortiz was placed on a ninety-day performance improvement plan based on the hearsay of a peer.   In the same department, but not under Wylie's supervision, Irma Garcia was harassed, had a nervous breakdown, and was given bad performance evaluations, which she refused to sign.

Moreover, others in Plaintiff's department beside Plaintiff engaged in practical jokes without consequences.  For example Oscar Killian and Stephen Shutt forwarded emails of questionable nature, i.e., that were pornographic and "sexually laden."  White males Don Scott Gray, Del Ray Bruce, Ray Lewis, and Michel Grubbs were supervisors in other departments and all forwarded sexually-laden emails.   Other employees, including white males Michel Grubbs, Oscar Killian, Kurt Voight, and Pete Mancuso and African American male Marcus Davis also had arguments in the workplace but were not given a Decision Making Letter or placed on probation.

On one occasion in 2005 Plaintiff claims he broke up a verbal altercation involving threats of physical violence between Jose Smith and Michel Grubbs.

Plaintiff states that after he was accused of not being able to get along with others, he was told he could not return to work without seeing the company doctor. He was diagnosed as bi-polar by that physician, purportedly without any tests being conducted. To make that assessment, the company doctor talked with Plaintiff over the telephone for twenty minutes and told Plaintiff that he had also talked to twelve of Plaintiff's co-workers. Plaintiff states that the diagnosis did not stand once an actual evaluation was done by his own physician.

### Relevant Law:  TCHRA

The TCHRA, Section 21.051 of the Texas Labor Code, provides in relevant part, "An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin or age the employer . . . discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment . . . ." National origin discrimination "includes discrimination because of or on the basis of the national origin of an ancestor" or "because an individual has the physical, cultural or linguistic characteristics of a national origin group." Tex. Lab. Code § 21.110; 29 C.F.R. § 1606.1. An "unlawful

-8-

employment practice is established when the complainant demonstrates that . . . national origin . . . was a motivating factor for an employment practice, even if other factors also motivated the practice."  Tex. Lab. Code § 21.125(a).  *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 479-80 (Tex. 2001).

In enacting the TCHRA, the Texas Legislature intended to correlate "state law with federal law in the area of discrimination in employment."  *Gold v. Exxon Corp.*, 960 S.W.2d 378, 380 (Tex. App.--Houston [14th Dist.] 1998, no writ).  The case law developed under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, governs claims under the TCHRA.  *Texas Dep't of Human Services v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995).  TCHRA's express purpose is "the execution of the policies embodied in Title VII."  *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex. 1991); Texas Labor Code Ann. § 21.001(1).  Therefore courts interpret the TCHRA consistent with federal law.  *Leatherwood v. Houston Post Co.*, 59 F.3d 533, 536 n.5 (5th Cir. 1995); *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996); *Estate of Richard J. Martineau v. ARCO Chemical Co.*, 203 F.3d 904 (5th Cir. 2000)("When applying the TCHRA, we look to analogous federal law contained in 42 U.S.C. § 2000e *et seq.*").

A discrimination claim can be proven by direct or circumstantial evidence.  "Direct evidence proves intentional discrimination without inference or presumption when believed by

the trier of fact." *Jones v. Overnite Transportation Co.*, 212 Fed. Appx. 268, 272 (5th Cir. 2006), *citing Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).  "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 195 (5th Cir. 2001), *citing Portis v. National Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir, 1994); *Overnite Transportation*, 212 Fed. Appx. at 272.  If a plaintiff produces direct evidence of discrimination, he may "bypass the *McDonnell Douglas*[2] burden-shifting framework [discussed *infra*] commonly applied in discrimination cases and proceed directly to the question of liability." *Moore v. U.S. Dept. of Agric.*, 55 F.3d 991, 995 (5th Cir. 1995); *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 192 (5th Cir. 2001); *Stone v. Parish of East Baton Rouge*, No. 08-31008, 2009 WL 2169122, *2 (5th Cir. July 20, 2009).  "In such 'direct evidence' cases, 'the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.'" *Fierros*, 274 F.3d at 192, *quoting Brown v. East Miss. Elec. Power Assoc.*, 989 F.2d 858, 861 (5th Cir. 1993).

The burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), used to analyze a case under the federal discrimination statutes lacking direct evidence, applies

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

under the Texas statute.  *Wal-Mart Stores, Inc. v. Canchola*, 121
S.W.3d 735, 739 (Tex. 2003).   First the plaintiff must establish
a *prima facie* case of discrimination by showing (1) he is a member
of a protected class (Hispanic); (2) he is qualified for the
position he held; (3) he suffered an adverse employment action; and
(4) non-protected class employees were not treated similarly.
*Abarca v. Metro. Transit Auth.,* 404 F.3d 938, 941 (5th Cir. 2005).
Different facts may require modifications of the elements of a
*prima facie* showing.  *McDonnell Douglas*, 411 U.S. at 802 n.13.

    For the third prong of the *McDonell Douglas prima facie* case,
an adverse employment action "'include[s] only ultimate employment
decisions such as hiring, granting leave, discharging, promoting,
or compensating.'"  *McCoy v. City of Shreveport*, 492 F.3d 551, 559
(5th Cir. 2007), *quoting Green v. Administrator of Tulane Educ.
Fund*, 284 F.3d 641, 657 (5th Cir. 2002).  "Title VII was only
designed to address '*ultimate* employment decisions, not to address
every decision made by employers that arguably might have some
tangential effect upon those ultimate decisions.'"  *Burger v.
Central Apartment Mgmt., Inc.,* 168 F.3d 875, 878 (5th Cir.
1999)(emphasis in original), *quoting Mattern v. Eastman Kodak Co.*,
104 F.3d 702, 707 (5th Cir.), *cert. denied*, 522 U.S. 932 (1997).
To be actionable, an adverse employment decision must be a
"tangible employment action that constitutes a significant change
in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998).

As examples, by themselves documented reprimands, though potentially affecting future employment decisions, do not qualify as adverse employment decisions. *Thompson v. Exxon Mobil Corp*., 344 F. Supp. 2d 971, 981 (E.D. Tex. 2004), *citing Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002)(*abrogated on other grounds in retaliation cases only by Burlington N.*), and *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 470 (5th Cir. 2002). The same is true of negative performance evaluations, even if they were not deserved. *Thompson*, 344 F. Supp. 2d at 981 (and cases cited therein). Disciplinary write-ups also fail to qualify as adverse employment actions. *Id.* at 982, *citing Mattern*, 104 F.3d at 707, and *Carthon v. Johnson Controls, Inc.*, 100 Fed. Appx. 993, 997 (5th Cir. 2004)(The employee's "receipt of a single disciplinary warning--without an attendant change in the terms or conditions of his employment--does not qualify as an ultimate employment decision."). *See also Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000)(employer's decision to take away a big account from an employee after she filed an EEOC complaint did not constitute an adverse employment action even though it decreased her chances of advancement); *Davis v. Miss. Transp. Commission*, 618 F. Supp. 2d 559, 564 (S.D. Miss. 2009)("[W]e have repeatedly held that an

employment action that limits an employee's future opportunities for promotion, but does not affect the employee's job duties, compensation, or benefits, does not qualify as an adverse employment action.").

A transfer may or may not be the equivalent of a demotion and thus qualify as an adverse employment action. *Alvarado v. Texas Rangers*, 492 F.3d 605, 613-15 (5th Cir. 2007). Even if a transfer does not "'result in a decrease in pay, title, or grade, it can be a demotion if the new position proves objectively worse--such as being less prestigious or less interesting or providing less room for advancement.'" *Id.* at 613, *quoting Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999), *citing Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir, 1996); *Click v. Copeland*, 970 F.2d 106, 109 (5th Cir. 1992); *Serna v. City of San Antonio*, 244 F.2d 479, 483 (5th Cir. 2001); and *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000)("In a Title VII case, a transfer to a different position can be 'adverse' if it involves reduction in pay, prestige or responsibility."). "Whether the new position is worse is an objective inquiry." *Alvarado*, 492 F.3d at 613-14, *citing Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004), "'[A] plaintiff's subjective perception that a demotion has occurred is not enough.'" *Id.* at 614, *quoting Forsyth*, 91 F.3d at 774, and also *citing Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 771 n.8 (5th Cir. 2001)("[T]he focus is on

-13-

the objective qualities of the positions, rather than an employee's subjective preference for one position over another. That subjective preference, alone, is an insufficient basis for finding an adverse employment action."); *Serna*, 244 F.3d at 483 ("[I]t is insufficient for a plaintiff to show merely that he has been transferred from a job he likes to one he considers less desirable. Rather, a plaintiff must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused [him] harm . . . .").

A suspension without pay may constitute an adverse employment action. *See, e.g., LeMaire v. Louisiana Dept. of Transp. and Development*, 480 F.3d 383, 390 (5th Cir. 2007)(two-day suspension without pay after engaging in a protected activity constituted adverse employment action); Bouvier v. Northrup Grumman Ship Systems, Inc., 350 Fed. Appx. 917 (5th Cir. 2009)(two-day suspension without pay constituted adverse employment action to support gender discrimination claim); *Burlington N. & Santa Fe Ry.*, 548 U.S. 53, 72-73 (37-day suspension without pay constituted a materially adverse employment action in a retaliation context even though the employee later received back pay).

For the fourth prong of a *prima facie* case, to show that an employee outside the protected class is "similarly situated" but treated more favorably a plaintiff must show that the alleged

misconduct of both employees was "nearly identical."[3]  *Wallace v.*
*Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001).  The Fifth
Circuit defines "similarly situated" narrowly.  *Silva v. Chertoff*,
512 F. Supp. 2d 792, 803 n.33 (W.D. Tex. 2007).[4]  Similarly

---

[3] *See Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259–
60 (5th Cir. 2009), discussing "similarly situated" employees:

> Employees with different supervisors, who work for
> different divisions of a company or who were the subject
> of adverse employment actions too remote in time from
> that taken against the plaintiff generally will not been
> deemed similarly situated.  Likewise, employees who have
> different work responsibilities or who are subjected to
> adverse employment action for dissimilar violations are
> not similarly situated.  This is because we require that
> an employee who proffers a fellow employee as a
> comparator demonstrate that the employment actions at
> issue were taken "under nearly identical circumstances."
> The employment actions being compared will be deemed to
> have been taken under nearly identical circumstances when
> the employees being compared held the same job or
> responsibilities, shared the same supervisor or had their
> employment status determined by the same person, and have
> essentially comparable violation histories.  And,
> critically, the plaintiff's conduct that drew the adverse
> employment decision must have been "nearly identical" to
> that of the proffered comparator who allegedly drew
> dissimilar employment decisions.  If the "difference
> between the plaintiff's conduct and that of those alleged
> to be similarly situated *accounts for* the difference in
> treatment received from the employer," the employees are
> not similarly situated for the purposes of employment
> discrimination analysis.  [footnotes omitted]

[4] District Court Judge Montalvo in *Silva* listed the following
examples in n.33:

> *Wheeler [v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir.
> 2005)], (finding insufficiently identical circumstances
> where the terminated white plaintiff and a black manager
> who remained employed had the same supervisor, were both
> company directors, and were both accused of removing
> company assets at relatively the same time; the Court of

situated individuals must be "nearly identical" and must fall
outside the plaintiff's protective class.  *Wheeler v. BL Dev.
Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).  Where different decision
makers or supervisors are involved, their decisions are rarely

---

Appeals noted that the white plaintiff lied repeatedly
during the course of the company's investigation, while
the black employee admitted her actions; in addition, the
value of the property the black employee removed was
"dramatically less" than the property the white plaintiff
removed); *Mayberry [v. Vought Aircraft Co.*, 55 F.3d 1086,
1090 (5th Cir. 1995)](finding that the plaintiff had not
shown "nearly identical" circumstances merely because he
produced evidence that white and black employees in the
same position had scrapped parts due to the employer's
operator error or poor workmanship, but were not
disciplined; the plaintiff had not shown that the
undisciplined employees had, like him, a history of poor
work performance and scrapped parts damage amounting to
$8,000); *Little v. Republic Refining Co.*, 924 F.2d 93, 97
(5th Cir. 1991)(concluding that the plaintiff had not
shown "nearly identical" circumstances because the
employee outside the plaintiff's protected class who
allegedly received more favorable treatment did not have
the same supervisor); *Smith v. Wal-Mart Stores (no. 471)*,
891 F.2d 1177, 1180 (5th Cir. 1990)(determining that the
plaintiff and the employee outside her protected class
who allegedly received preferential treatment were not
similarly situated where the employer discharged the
plaintiff because the plaintiff violated its non-
fraternization policy and the other employee's conduct
did not involve the employer's non-fraternization
policy).  "[P]ut another way, the conduct [or
circumstances] at issue is not nearly identical when the
difference between the plaintiff's conduct [or
circumstances] and that of those alleged to be similarly
situated accounts for the difference in treatment
received from the employer." *Wyvill v. United Cos. Life
Ins. Co.*, 212 F.3d 296, 304-05 (5th Cir. 2000)(finding
that the "striking differences" between the plaintiff's
and purportedly similarly situated employees outside the
plaintiff's protected class "more than account[ed] for
the different treatment they received.").

"similarly situated" in relevant ways for establishing a *prima facie* case. *Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971 (E.D. Tex. 2004), *citing Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) for the proposition that "[a] demonstration of substantial similarity generally requires a showing that a common supervisor was involved in the decision making"). *See also Perez v. Texas Dep't of Criminal Justice, Inst'l Div.*, 395 F.3d 206, 213 (5th Cir. 2004)("We . . . have explained consistently that for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'"); *Hockman v. Westward Communications, LLC*, 282 F. Supp. 2d 512, 527-28 (E.D. Tex. 2003)("The 'nearly identical' standard, when applied at the *McDonnell Douglas* pretext stage, is a stringent standard--employees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical.'"), *citing Okoye v. Univ. of Tex. Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001)(Employees are not in nearly identical circumstances when their actions were reviewed by different supervisors; "to establish disparate treatment a plaintiff must show that the employer 'gave preferential treatment to [] [another] employee under 'nearly identical' circumstances' . . .; that is "the misconduct for which

-17-

[plaintiff] was discharged was nearly identical to that engaged in by . . . [other] employee[s].'"")).

If the plaintiff makes a *prima facie* case, there is a presumption of discrimination, and the burden of production then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. *Chevron Phillips*, 570 F.3d at 615.

If the employer succeeds, the framework falls away, the presumption of discrimination dissolves, and the issue becomes discrimination *vel non. Id.* The burden of production then shifts back to the plaintiff to show that the employer's stated reason was false and was a pretext for discrimination. *Id.* Although the intermediate burden of production shifts back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Plaintiff must then show, with substantial evidence, that each of the employer's proffered justifications was mere pretext for discrimination. *Reeves*, 530 U.S. at 143; *Wallace v. The Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001), *cert. denied*, 535 U.S. 1078 (2002). Although the presumption of discrimination has disappeared, the trier of fact may consider evidence establishing the plaintiff's *prima facie* case and inferences drawn therefrom in

determining whether the employer's explanation is pretextual. *Reeves*, 530 U.S. at 143. Coupled with the Plaintiff's *prima facie* case, the evidence of pretext usually will constitute sufficient evidence to raise an issue of material fact as to whether the employer's reason is credible or merely a pretext for discrimination or, if its reason is true, that a discriminatory reason more likely motivated the decision to effect its adverse employment action. *Reeves*, 530 U.S. at 143, 147-49.[5] Sometimes, however, additional evidence may be required. *Id.* "[T]he factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff. The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct.' In other words, '[i]t is not enough . . . to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination.'" *Id.* at 146-47 (emphasis in original), *citing St. Mary's Honor Center*, 509 U.S. at 511, 524, 519. "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those

---

[5] In *Reeves*, the Supreme Court found that the Fifth Circuit panel "erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 149.

include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148-49.

Alternatively, rather than demonstrating that the defendant's articulated reason for its action is a pretext for discrimination, the plaintiff may show that the defendant's reason for the decision, while true, is only one reason for its conduct and another motivating factor is plaintiff's protected characteristic.[6] *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *Pinkerton v. U.S. Dept. of Educ.*, 508 F.3d 207, 213 (5th Cir. 2007).

### Defendant's Motion for Summary Judgment (#18)

With supporting documentary evidence, Defendants assert that as a matter of law Plaintiff cannot make a *prima facie* case of national origin discrimination because (1) he admits that there is no evidence that a similarly situated non-Hispanic person engaged in the same activities as Ochoa was treated more favorably, and, alternatively, (2) BP Products has articulated a legitimate, non-discriminatory reason for Plaintiff's termination and Ochoa has no evidence that this reason is false and a pretext for discrimination or that his national origin was a motivating factor in any

---

[6] The Fifth Circuit calls this the "modified *McDonnell Douglas*" approach. *Rachid*, 376 F.3d at 312.

employment actions.  It asserts that as its evidence demonstrates, it provided to Plaintiff, before terminating him, formal coaching, a Decision Making Leave, and a Last Chance Agreement, which he violated by making a harassing phone call to Defendant's plant security.  Moreover BP Products maintains that Ochoa has admitted to his conduct.

Defendant's recitation of the facts, supported by uncontroverted summary judgment evidence, is more detailed than Ochoa's and evidences the pattern of repeated inappropriate and unprofessional behavior by Plaintiff that Defendant articulates as the reason for its disciplinary actions and ultimate termination of Plaintiff.

The Court summarizes BP's key facts where they differ or supplement Plaintiff's complaint and BP's supporting documentary evidence.

When Plaintiff was transferred to HSSE and became a Compliance Auditor in November 2006, his first supervisor was a Caucasian, Steve Aldrich, who in turn reported to Jim Wallace.  Ochoa Dep., Ex. A at  p. 33, ll. 9-14, p. 44, ll. 1-11; Feb. 28, 2007 HSSE Organization Chart, Ex. A-5; Summary Chart of Employment Records ("Summary Chart"), Ex. J.  In March 2007, Caucasian Richard Coleman became Ochoa's supervisor.  Ochoa Dep., Ex. A, p. 40, l. 22-p. 41, l.2; Nov. 30, 2006 HSSE Org. Chart, Ex. A-4; Summary chart, Ex. J. There were two other Compliance Officers working with Ochoa, James

Anderson and David King, but the three did not get along.  On March 8, 2007, Coleman met with Ochoa about the problem, and his "coaching notes" (Ex. A-7), specify four behaviors that Coleman wanted Ochoa to change:  "1) Joking around to the point of not being taken seriously in matters that are serious to the company, such as the safety reports he issues[7] . . . .; 2) Exhibiting defensive behavior to constructive criticism given by his coworkers regarding development of safety protocols that the entire team will use and held [sic] accountable for;  3) Avoiding interacting with and not speaking to his coworkers; 4) Lack of teamwork with his coworkers."  Ochoa agreed to work on contributing to a better team, but insisted "at the same point, there was--there was more than just me, you know."  Ochoa Dep., Ex. A at p. 63, l. 8-p. 64, l.5.

On April 2007, Coleman announces to Ochoa that Ochoa was being transferred to the Permit Verification team.  It was a position that Ochoa did not apply for and for which he did not see the job posting.[8]  Ochoa Dep., Ex. A at p. 34, l. 20-p. 35, l.19; p. 64, l.

---

[7] Coleman's coaching notes state,

I told Danny that Steve and I had received a request that Danny no longer put humorous comments on the cover sheet of the Gun Drill Reports, because the comments could be construed by some people that we're not taking the safety report seriously.  The request came from a manager outside our department.  Danny immediately became very defensive.

[8] Defendant highlights this fact as evidence that BP Products was not discriminating against him as a Hispanic, but since Ochoa stated during his deposition that he had lost his ability to speak

16-p. 65, l.5; p. 69, l. 7-p. 70, l. 14; Permit Verification
Representative Job Detail, Mar, 27, 2006 ("PVR Detail"), Ex. A-9.
Ochoa's new supervisors were Caucasian Stephen Shutt and Caucasian
B.J. Wylie, who in turn reported to Caucasian Kevin Fontenot, with
Jim Wallace still head of the department.

The summary judgment evidence shows that Ochoa had a personal
"history" with Wylie and that Ochoa focuses on Wylie as the key BP
Products figure who discriminated against him and allegedly made
racially derogatory remarks about "minorities," including women.
Ochoa Dep., Ex. A at p. 73, l. 12; p. 76, l.9-p. 77, l. 19; p. 78,
l.11-p. 80, l. 13, p. 84, ll. 5-12.  Wylie and Ochoa had worked
together earlier, in the mid 90's with Ochoa at the Alky 2 unit and
Wylie at Alky 3 unit; the two units were soon combined under one
supervisor and Wylie became Ochoa's shift supervisor.  *Id.* at p.
22, ll. 5-10, p. 77 ll. 5-19, p. 78, l.11-p. 83.  Ocho alleges that
he was offended because Wylie called him by the nickname "Danno"
and asked Wylie to stop; it took a while, but Wylie finally
stopped.  *Id.* at p. 22, ll. 1-24.  Ochoa also complains that around
that time when he was an operator ("probably '94, '95"), he once
overheard Wylie, when "[h]im and somebody else were joking," use

_____

Spanish fluently, though he could understood what a speaker said,
the Court finds that this fact is not significant here.
     The Court observes that Ochoa did not object to the transfer
during his deposition or in any of the other documents submitted as
summary judgment evidence by BP Products, although as discussed he
had objections to working under Wylie.

the racially derogatory "N-word". *Id.* at p. 76, l.9-p. 77, l. 19. Ochoa also conceded during his deposition that he had lent Wylie's brother-in-law a gun, and that the brother-in-law used it to commit suicide. *Id.* at p. 73, ll.16-23. Ochoa claims that after he was moved into the Permit Verification job he told Fontenot and Wallace that he could not work with the man, but they told him to "shut up." *Id.* at p. 73, l.23-p. 74, l.7.

In an incident that made Ochoa take "notice of Mr. Wylie and his manners, and so to speak, that I really tried to distance myself from him," Ochoa testified that Wylie directed his operators to release a dangerous amount of hydrofluoric acid into the atmosphere late at night when nobody was around. *Id.* at p. 78, ll. 16-19, p. 79, ll. 9-15. His board operator, Hispanic Reynaldo Lira, became upset and urged him not to do such a dangerous thing, but Wylie went ahead anyway. *Id.* at ll. 16-20. Lira reported it to someone and an investigation was done, but Wylie was only "smacked on the hand. I'm not sure exactly what happened." *Id.* at ll. 21-15. Ochoa stated that after that episode, Wylie did not want to have anything to do with Lira. When asked why and if Wylie ever said it was because Lira was Mexican American, Ochoa replied that "Not in front of me," nor did Ochoa ever observe or hear that Wylie had done so out of Ochoa's presence. *Id.* at 80, l. 17-p. 81, l. 3.

-24-

Ochoa further discussed another incident with a very good-looking, charismatic operator at Alky 3, Hispanic Armando Telo, who often told Ochoa that Telo did not like working for Wylie and hated coming to work. *Id.* at p. 81, ll. 4-19.   After Wylie started disciplining Telo, Ochoa stated initially that Telo was terminated, but then Ochoa back tracked and conceded he did not know, that Telo was promoted and moved on to chemicals, and that Ochoa did not know if he got downsized, or if he filed a complaint. *Id.* at p. 81, l.20-p. 82, l. 82.   Ochoa maintained that Telo made a big issue about being passed over for a supervisor job, that Telo took a supervisor position outside of the refinery when oil and chemical groups were split into two, but that Telo ended up being terminated for absenteeism because he "just got to the point where he hated coming to work." *Id.* at p. 82, ll. 1-24.   Ochoa conceded that he did not remember ever hearing Wylie say anything racially derogatory about Telo. *Id.* at p. 82, l. 25-p. 82, l. 2

On May 30-31, 2007, soon after he became part of Permit Verification, another incident occurred which resulted in progressive disciplining of Ochoa.   He drove his vehicle into the area of the Ultratransformer Unit 3 ("UU3"), where he was stopped by Ted Sharp, a contractor job representative who told Ochoa he should not be driving on the unit.   Ochoa Dep. Ex. A. at p. 88, l. 14-p. 90, l. 9, p. 96, ll. 1-5; UU3 Incident Report, Ex. A-11; Ochoa UU3 Statement, Ex. A-11.   Ochoa claimed there was no warning

sign and that he merely followed a vehicle in there.   Blake
McCaskill entered an Incident Report about the event into the BP
Traction System.  Ochoa Dep., Ex. A, at p. 88, l. 24-89, l. 16; UU3
Incident Report, Ex. A-11; Ochoa UU3 Statement, Ex. A-10.  Ochoa
admitted that he should not have driven into the unit and that he
was not assigned there and not working there.  Ochoa Dep., Ex. A,
at p. 89, l. 12-p. 90, l.9; Ochoa UU3 Statement, Ex. A-10.  Ochoa
complained that he did not mind being told he was wrong, but he
objected to the way or manner he was told by Sharp.   After his
first confrontation with Sharp, he went to a meeting, but returned
after it and argued with Sharp, went to see Sharp's supervisor, and
the next day returned to speak to Sharp's supervisor again. *Id.* at
p. 89, l.12-p. 90, l.9; Ex. A-10.   Wylie was in charge of the
investigation that followed.  Ochoa Dep. Ex. 10 at 93, l. 14-p. 95,
l.25.

As a result of this incident Ochoa received a Decision Making
Leave ("DML") letter (Ex. A-12), "the second highest part" of the
progressive discipline process, dated June 14, 2007 and initialed
by Wylie.  Ochoa Dep., Ex. A. at p. 97, ll. 17-25.  The DML letter,
admonishing him to "seriously consider whether or not [he] wanted
to continue [his] employment with BP," references several dates to
demonstrate "a pattern of unacceptable professional behavior":
February 6, 2007, when Ochoa "became defensive after co-worker gave
[him] feedback on a presentation" when he and his coworker were

brought in to review the problem and committed themselves to finding ways to work together and improve their behavior, tone, and words; February 28,, 2007, when he again became defensive and condescending toward a different co-worker who gave Ochoa input on an audit finding; March 8, 2007, when he was brought in for the coaching session by his supervisor Coleman (Ex. A-7); and May 29, 2007, the incident at UU3, when he again became defensive and acted inappropriately.  Ex. A-12.  He was placed on a DML to remain active for twenty-four months and warned, "Any future incidents could lead to further disciplinary action up to and including termination."  Ochoa testified during his deposition that he did not know of any other person in HSSE who had an incident like the UU3 incident.  Ochoa Dep., Ex. A at p. 111, l. 12-p. 112, l.1.

The next incident that led to Ochoa's termination occurred on August 9, 2007, when Ochoa forged two emails that falsely stated that extended overtime work would be required of employees, a matter that could have safety implications, in order to play a joke on a co-worker, Curt Voight.  Ochoa claimed that he had previously asked Wylie's permission to play a joke on the employee with an email, but conceded that he did not tell Wylie that he was going to send it out under Snider's and Shutt's names.  He claims the rest of the PVR group was aware of the joke.  He cannibalized emails from his supervisor, Shutt, and a manager at the refinery, Carl Snider, and created an email seemingly from Snider to Shutt and

Wylie, Ochoa's two bosses, another purported  forwarded by Shutt to
the PVR team, and a purported response from Ochoa.  Ochoa Dep., Ex.
A at p.112, l. 12-p. 125, l. 7.  In Snider's manipulated email (Ex.
A-13), he informed employees that work in another plant required "2
P.V. Representatives on nights and weekends for the next two plus
months. . . . For those who live long distances, rooms at the
Hampton Inn in Texas City will be available."  Then purportedly
Shutt forwarded it to the team and asked them to "look at it and
decide if you want to volunteer for the nights.  Also if you need
to stay in town and use the hotel option."  Ex. A 13.  Ochoa's
return email response to the team was, "I do not want to work 7
twelve's and be put up in a hotel room.  I am going home to my
family.  If you want it[,] you can have it."  *Id.*  Wylie's reaction
when he found out was to order Ochoa to send out another email
saying the first was a joke.  Ochoa Dep., Ex. A at p. 126, ll.18-
25.  That night, when Ochoa got home, he received a phone call from
Fontenot, who told him that he was "crisis suspended" and that his
joke email was a falsification of company records.  *Id.* at p. 126,
ll. 6-11.  Ochoa testified that he did not know of anyone who sent
out an email under a top manager's name and did not get in trouble.
*Id.* at p. 127, ll. 8-11.  Moreover he emailed Caucasian Keith
Casey, head of the refinery, and stated that he knew he "did wrong"
but that he felt he was being harassed and singled out and did not
know why; elsewhere he conclusosrily asserted that he was being

-28-

harassed because of his national origin by Wylie.  *Id.* at p. 128,
ll. 22-p. 130, l. 10, p. 132, ll. 20; Email to Casey, Ex. A-15.

The email incident led to BP Products and Ochoa's entry into
a Last Chance Agreement ("LCA"), which was to be in effect for two
years.[9]  Ex. A-17; Ochoa Dep., Ex. a at p. 136, l. 21-p. 137, l.4.

The "final straw" came on December 12, 2007 when Ochoa made a
call to security, which he described as a joke and security
characterized as harassment.  Ochoa Dep., Ex. A at p. 158, l.20-p.
160, l. 24; Security Report, dated Dec. 12, 2007, Ex. A-23.  At
3:00 a.m. in the guard shack Ochoa talked to security guard Shona

---

[9] The LCA (Ex. A-17), dated August 20, 2007 and signed by
Fontenot, stated,

On Monday, August 13, Kevin Fontenot and Jim Wallace met
with you to review your overall behavior and work
performance.  On August 9, 2007, you sent an e-mail that
appeared to be from other individuals as a practical
joke,  The e-mail that you sent was totally inappropriate
and created a very intense environment until it was
discovered to be a hoax.

On June 12, 2007, you were issued a Decision Making Leave
(DML) for two years because of a pattern of inappropriate
behaviour.  This recent incident is another example,
Danny, of how you fail to appreciate how your conduct and
behaviour impacts others [*sic*] around you.  Therefore you
are being given five (5) days off without pay and will be
placed on a Last Chance Agreement when you return.  This
agreement will continue for two years (24 months) from
the date it is issued.

Danny, your inappropriate behaviour including unsuitable
us of the site email system, practical jokes, and
unprofessional comments to others will not be tolerated.
Any further incidents will lead to termination.

Lillie about his job and seemed depressed. He left to have a cigarette and Lillie reported the conversation to security because the discussion "felt uncomfortable." A-23. Ochoa returned to talk to her again. About 25 minutes later, Ochoa called security and spoke to security guard David Johnson, asked Johnson what Lillie's last name was, and said he wanted to report that Lille was "looking at him like she wanted to hurt him." *Id.*; Ochoa Dep., Ex. A. at p. 160, ll. 10-24. Ochoa then said he was joking, and just wanted to know her name. Ochoa also told Johnson that Ochoa wanted to report female security officer Letricia Wright for "always undressing him with her eyes." *Id.* During the next hour, Ochoa emailed Lillie and called her twice, and the conversations were recorded. Security Report, Ex. A-23; Ochoa Dep. Ex. A at p. 161, l. 16-p. 162, l. 8. The next day Human Resources Representative Melanie Hughes called Ochoa, and he admitted that he had made the comments about Lillie and Wright. Ochoa Dep., Ex. A at p.67, ll. 15-25; Fontenot Dep., Ex. B, p. 21, ll. 9-10. Hughes further asked Ochoa to come in to meet with her, but Ochoa said no and that he did not want to be harassed any more. Ochoa Dep., Ex. A at p. 168, ll. 1-7. Hughes responded that if he did not come to work, his employment would be terminated. *Id.* at ll. 13-15. During his deposition Ochoa testified that he did not know of anyone who made comments to a security officer like those he made about Lillie and

Wright and was not disciplined for doing so.  *Id.* at p. 172, l. 19-
p. 173, l. 2.

BP states that it terminated Ochoa on December 13, 2007 for
"admittedly unprofessional, inappropriate comments" to security in
"direct violation of [his] Last Chance Agreement."  *Id.* at 17, ll.
3-9; Dec. 13, 2007 Termination Letter, Ex. A-27.  Keith Casey,
Safety Superintendent Kevin Fontenot, and Human Resources Advisor
Melanie Hughes were involved in the decision to terminate Ochoa.
Fontenot Dep., Ex. , p. 35, ll. 18-20; Affidavit of Melanie Hughes,
Ex. K, ¶ 3.  B.J. Wylie did not participate in the termination
decision.  Hughes Affidavit, Ex. K, ¶ 3.  Keith Casey made the
final decision.  Ochoa Dep., Ex. A, p. 176, l. 22-p. 177, l.8.

BP points out that Ochoa has admitted that he has no evidence
that someone with his discipline record (coaching and counseling by
Coleman about getting along with his co-workers, a DML after the
UU3 incident and suspension without pay after an argument reported
in Traction, placement on crisis suspension and a LCA after
cannibalizing an email by his supervisors Shutt and Snider, and a
violation of the LCA by making unprofessional and inappropriate
remarks to security) was not terminated after an additional
unprofessional incident.  Ochoa Dep., Ex. a at p. 176, ll. 12-21.
BP asserts that Ochoa therefore cannot make a *prima facie* case of
discrimination because he cannot show that any non-Hispanic
similarly situated person was treated more favorably.

BP Products observes that Ocho identifies as improperly treated at work only two Hispanic employees, Enrique Ortiz and Irma Garcia.  Garcia worked in the environmental group, and Ochoa conceded that she was not similarly situated.  He further admitted that the issues relating to Ortiz and Garcia were not the same as his.  Ochoa Dep., Ex. a at p. 186, ll. 2-p, 187, l. 14 and p. 183, ll. 14-17.  The Court notes that Ochoa also singled out Reynaldo Lira and Armando Telo as Hispanics disciplined by Wylie because of difficulties with Wylie.  Nevertheless Ochoa was extremely vague about what happened with each and what the results were, and the two were clearly not similarly situated to Ochoa:  he stated that Lira complained about Wylie's alleged secret release of hydrofluoric acid, while Telo was disgruntled about being passed over for a supervisory position and was terminated for absenteeism.

BP Products argues that there is no direct evidence of racial animus by any BP employees because Ochoa testified that he never heard Aldrich, Shutt, Fontenot, Wallace or Casey make racially derogatory remarks and he never heard anyone attribute such comments to Fontenot, Wallace or Casey.  Ochoa Dep., Ex. A at p. 68, l. 25-p. 69, l. 6, p. 73, ll. 6-11, p. 86, l. 3-p. 87, l. 2 and l. 24-p. 88, 1.4.

Moreover, when Ochoa was transferred to the PVR group, a Hispanic male Rogerio Balerio replaced Ochoa in the Compliance group.  After Ochoa was terminated on December 31, 2007, the PVR

employees under Wylie and Shutt were composed of two Caucasian males, two African American males, and two Hispanic males. HSSE Organization Chart, Ex. 94.  In January 2008 BP Products hired three new PVRs:  one Hispanic and two Caucasians.

BP also contends that Ochoa caused his own termination even though he only admits his conduct played a role.  BP insists that it has demonstrated a legitimate, nondiscriminatory reason for the termination, a consistent pattern of joking and confrontational behavior that was disruptive to the work place.  Each time Ochoa was disciplined, he was warned that continuing misconduct would result in additional discipline, up to and including termination. His failure to meet these standards and behavioral expectations resulted in his termination.  *See Molina v. Equistar Chemicals, L.P.*, Civ. A. No. C-05-327, 2006 WL 1851834, *2, 8-9 (S.D. Tex. June 20, 2006)(holding employer's rationale for terminating operator after he received a DML and a LCA for performance deficiencies, including making "sarcastic, caustic remarks to co-workers," was a legitimate, non-discriminatory reason).  Ochoa has no evidence that these reasons were a pretext for unlawful discrimination.

More to the point, he has no evidence that his national origin was a motivating factor.  While he blames Wylie for putting him in a position in which he would be terminated for everything he did, Wylie was not involved in the decision to terminate him.  According

to his deposition testimony, Ochoa did not hear Wylie make any discriminatory comments about Hispanics nor did he hear anybody else attribute such comments to Wylie.   His claim is purely subjective speculation, insufficient to show a discriminatory animus.

### Court's Decision

The Court agrees with BP Products that Plaintiff's own testimony, in addition to other evidence, demonstrates that he cannot make a *prima facie* case of discrimination based on his nation origin, Hispanic.   He has not shown that there is anyone non-Hispanic who was "similarly situated," but was treated more favorably under the Fifth Circuit's narrow construction of that prong.

Furthermore even if he had, BP Products has not only articulated, but supported with substantial summary judgment evidence, including Ochoa's own statements, its reasons for disciplining him and its clearly adverse employment actions of suspending him without pay and ultimately terminating him. Plaintiff did not respond and did not submit any evidence that would raise a material issue of fact for trial regarding these reasons.

Accordingly, the Court

ORDERS that BP Product's request for ruling (#22) and motion for summary judgment (#18) are GRANTED.

-34-

**SIGNED** at Houston, Texas, this 29th day of March , 2011.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE